NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1258n.06

No. 12-3005

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

EVETTE FIELDS,

  Plaintiff-Appellant,

v.

FAIRFIELD COUNTY BOARD OF
DEVELOPMENTAL DISABILITIES,

  Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

FILED
*Dec 06, 2012*
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

Before: MERRITT, McKEAGUE, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge. Plaintiff Evette Fields filed suit against defendant Fairfield County Board of Developmental Disabilities (the Board) for alleged violations of the Family Medical Leave Act of 1993 (FMLA) and Ohio's anti-discrimination statutes. The district court granted the Board's motion for summary judgment on both claims. Fields challenges this decision. We **AFFIRM** the judgment of the district court.

## I. BACKGROUND

From March 2003 until June 30, 2007, Evette Fields worked as the administrative assistant to John Pekar, the Board superintendent. Fields's main duties included managing the business functions of Pekar's office; serving as his confidential secretary; and putting together the Board's packets for its monthly meetings, which contained information to be reviewed by the Board and items for the Board's action.

Initially, Fields also supervised the Board's receptionist, Rhonda Alspach. When Alspach complained that Fields mistreated her, the Board hired an independent management group to investigate the matter. In addition to finding problems with Alspach's job performance, the investigator determined that there was a lack of trust between Alspach and Fields and that Fields often used an inappropriate tone when addressing Alspach's performance problems. The investigator recommended that Alspach be removed from Fields's supervision and, though observing that there were potential problems with Fields's trustworthiness, concluded that those problems likely stemmed from her conflicts with Alspach and could be sufficiently resolved. Fields claimed that the investigation soured her relationship with Pekar and caused her to mistrust him. Pekar and human resources director Cindy Hillberry also noted that the investigation affected the relationship between Fields and Pekar.

At some point after her transfer, Alspach began having problems with her new supervisor, Nate Griffin. Observing that Griffin was very disrespectful to Alspach, Fields complained to both Pekar and a Board member that these problems, though comparable to those alleged as to her, were not investigated and that she was held to a different standard than Alspach's male supervisor.

In August 2005, Pekar formally disciplined Fields for errors in Board packets. Pekar indicated that he had discussed the problem with Fields in February 2005, yet errors continued to be present. Pekar also noted that several Board members expressed concerns regarding the errors. Although she took responsibility for clerical errors, Fields claimed that she received information from other parties too late to include it in the packet or to review it before the packet was distributed.

In September 2005, the Board adopted a "Plan to Address Absenteeism," which evaluated sick leave usage quarterly based on the preceding twelve months. The policy established four levels

of sick leave usage and specifically excluded FMLA leave. Under Level 1, an employee who worked 260 days a year for eight hours a day and used 40 hours or more of sick leave received a notice, and although no disciplinary action was taken, the employee could request a meeting with a supervisor to discuss the circumstances. Under Level 2, an employee who used 80 or more hours of sick leave received a notice; was required to meet with a supervisor; and was required to submit a doctor's excuse for any absences during the subsequent three months. No disciplinary action was taken until sick leave usage reached Levels 3 and 4.

The Board had specific procedures for taking FMLA leave, requiring medical certification from a health care provider in certain circumstances. In December 2005, Fields took FMLA leave; although the record does not include Fields's leave requests, the Board's sick leave usage report indicates that three days were initially classified as FMLA leave.

At some point in her tenure, Fields applied for a position with quality control. Though she was ultimately informed that a degree was a mandatory requirement for the position and she did not hold one, Fields was upset after finding out secondhand that Nate Griffin hired a male for the position. Fields informed Pekar that she overheard Griffin state that he wanted to hire a male. Fields also complained in e-mails to former Board employee Lea Pennington about what she believed were discriminatory practices by the Board. On March 13, 2006, Fields sent Pennington an e-mail stating that she did not "have the right anatomy" for the quality control position. Complaining of age and gender discrimination, she noted that another person, who was apparently disrespectful to her superiors, received a raise and she jokingly wrote that only a person under 40 would be so rewarded. Pennington wrote that Fields should "[s]ue them. No kidding[.]" Fields subsequently requested and the next day received contact information for the Ohio Civil Rights Commission.

3

During this March time frame and unbeknownst to Fields, Pekar began having all her e-mails forwarded to him. He claimed that he was concerned about Fields's opinion of him and suspected that she was discussing their working relationship with others. Because human resources director Hilberry "heard through the grapevine" that Fields was threatening to sue the Board for discrimination after she was not hired for the quality control position, Hillberry requested that Griffin document his interactions with Fields. Griffin's documentation was initially dated March 14, 2006 and was updated two days later.

In May 2006, Fields submitted FMLA certification for surgery that occurred in late April. The following month, she received the first of three Level 1 sick leave usage notices from Pekar, which indicated that she had taken 67 hours of leave since May 12, 2006. Fields sent a memo to Pekar explaining that much of the time was for an ongoing condition that had been corrected by the April surgery and that she had provided physician's slips with her leave requests. Pekar directed Fields to Tracey Lee, who was responsible for recording FMLA leave. Fields sent a memo to Lee, copying both Pekar and Hillberry, which stated that four dates—December 15, 2005; April 5, 2006; April 6, 2006; and April 26, 2006—should have been designated as FMLA leave. Fields then sent an e-mail to Hillberry on June 29, 2006, asking whether the dates could be designated as FMLA leave. Hillberry explained that a doctor's excuse was not the same thing as FMLA certification and that while Fields had submitted the appropriate paperwork for her surgery, she had not done so for the four dates in question. After Fields sent a second e-mail claiming that she had submitted the correct paperwork, Hillberry stated that Pekar could decide whether to designate the leave retroactively. He subsequently did so.

Between July and August 2006, Pekar documented several instances of work performance problems and claimed that his communication with Fields during this time continued to suffer. On August 31, Hillberry informed Fields that a particular item needed to be added to the Board's agenda. Hillberry sent a follow-up e-mail pointing out that the item did not make it onto the agenda.

On December 4, 2006, Fields received her second Level 1 sick leave notice, which noted that she had used 75 hours of sick leave since October 1. The next day, Fields requested copies of her sick leave usage reports from Pekar. On January 3, 2007, Fields received her third Level 1 sick leave notice, which noted that she had used 60 hours of sick leave since December 8, 2006. Fields met with Pekar and told him that she believed she was being disciplined for taking FMLA leave, although she conceded that Pekar "may have" informed her that the notices were not disciplinary in nature. Hillberry also explained to Fields in an e-mail that the notifications were meant to inform her of sick leave usage and did not constitute discipline. On January 17, 2007, Hillbery informed Fields that the disputed dates would be retroactively designated as FMLA leave if Fields provided proper medical documentation. Hillberry agreed to obtain the documentation by fax, and all four dates were retroactively designated.

Fields took FMLA leave in January, February, and March 2007. On March 19, Pekar sent an e-mail to Hillberry complaining about Fields's delay in informing him of a new Board appointment. Pekar sent a memo to Fields the next day requesting that all correspondence be given to him on the day it was received. On March 21, Hillberry sent an e-mail to Pekar complaining that Fields did not send a motor vehicle record request for a new hire in a timely manner and that the employee ended up having an unacceptable record. Hillberry noted that this problem had occurred

previously and that Fields had then shared information about Pekar's driving record to "cover her own tracks."

On that same day, Fields was informed that she would be placed on paid administrative leave until the expiration of her contract and that her contract would not be renewed. She was also provided with a performance evaluation, in which Pekar stated that he hesitated to give Fields confidential materials because of her "negative attitude"; her expressed mistrust in him; and an incident in which she disclosed information from an employee's personnel file. Pekar also noted that Fields miscommunicated information to other employees about sick leave usage notices, informing them incorrectly that the notices constituted disciplinary action. Hillberry observed that several employees had been upset when Fields told them that the notices were disciplinary in nature because the employees had been previously told that they were not. Pekar viewed Fields as stubbornly maintaining that all sick leave usage notifications were disciplinary write-ups despite several supervisory explanations to the contrary. Moreover, he noted that Fields misfiled Level 1 and 2 notices in the disciplinary section of personnel files. When one of the employees was investigated for a separate disciplinary action, the sick leave notice was initially considered by the investigator, which Pekar thought could have affected the outcome. Pekar also noted that Fields had problems in the area of job performance, specifically in her preparation of Board packets. He viewed Fields as not taking this responsibility seriously and instead blaming others for her mistakes.

In sum, Pekar viewed Fields as having two "problem areas" affecting her continued employment with the Board: (1) the inconsistent quality in Board packets and (2) the lack of trust in their relationship. As to the second point, Pekar claimed to question Fields's "confidentiality and

6

loyalty" in part because "[s]he has been heard to communicate to other staff that she is suing the Board and me for 'harassment.'"

Fields filed suit against the Board on December 1, 2009, initially asserting only FMLA-based claims. She alleged that the Board unlawfully used FMLA-protected absences as a negative factor that played a part in her discharge; discharged her in retaliation for taking FMLA leave; disciplined her and ultimately discharged her for complaints regarding the manner in which her FMLA-protected absences were treated; required her to complete work while on FMLA leave; and discouraged her use of FMLA leave. Fields also alleged that these violations were "willful." Fields subsequently amended the complaint to include claims under Ohio law, alleging that the Board retaliated against her for complaining about age and/or gender discrimination.

The Board filed a motion for summary judgment, contending that Fields's FMLA claim was untimely and that she could not establish violations of the FMLA or state law. Although ruling that the FMLA claim was timely, the district court granted the Board's motion on Fields's FMLA and state law claims. Fields appeals only the FMLA retaliation claim and state law claims.

## II. DISCUSSION

### A. Standard of Review

This court reviews a district court's grant of summary judgment de novo. *Chapman v. United Auto Workers Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 748 (6th Cir. 2012) (citing Fed. R. Civ. P. 56(a) & (c)). The burden falls on the moving party to demonstrate that no genuine issues of material fact exist.

7

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether summary judgment is appropriate, appellate courts view the facts, including all inferences, in the light most favorable to the nonmoving party. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A jury, rather than a judge, is responsible for making credibility determinations, weighing the evidence, and drawing legitimate inferences from the facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The central inquiry at the summary judgment stage "is whether the evidence presents a sufficient disagreement to require submission of [the plaintiff's] claims to a jury or whether the evidence is so one-sided that [the defendant] must prevail as a matter of law." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648 (6th Cir. 2012) (citing *Anderson*, 477 U.S. at 251-52). Because the Board moved for summary judgment, this court must view the evidence in the light most favorable to Fields and draw all reasonable inferences in her favor in determining whether a dispute of material fact exists.

**B.      FMLA Retaliation Claim**[1]

The FMLA allows an eligible employee to take a total of twelve weeks of leave each year in order to care for certain family members or if the employee has "a serious health condition that makes [him or her] unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(A)–(D). Covered employers are prohibited from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" under the statute. 29 U.S.C. §

---

[1]The district court concluded that Fields's claim was timely after determining that the three-year statute of limitations for willful violations of the FMLA was applicable. *See* 29 U.S.C. § 2617(c)(2). Although Fields and the Board present argument on the matter, the Board did not explicitly challenge the district court's ruling. We therefore decline to address this issue and assume for the sake of argument that Fields's claim was timely.

8

2615(a)(2). Employers cannot use FMLA leave as a negative factor in employment actions. *Hunter v. Valley View Local Schs.*, 579 F.3d 688, 690 (6th Cir. 2009). This court applies the familiar burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims brought under the FMLA. *Edgar v. JAC Prods. Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). As this court has explained,

> On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry. Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that a prima facie case of discrimination has been established. The defendant must then offer sufficient evidence of a legitimate, nondiscriminatory reason for its action. If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.

*Back v. Nestle USA, Inc.*, 694 F.3d 571, 576 (6th Cir. 2012) (citations and internal quotation marks omitted). The plaintiff's burden in establishing pretext "then 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "In evaluating pretext and the plaintiff's ultimate burden, the court should consider all evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." *Id.* The district court concluded that Fields did not establish a prima facie case.

In order to make out a prima facie case of retaliation under the *McDonnell Douglas* framework, Fields must demonstrate that: (1) she engaged in an activity protected by the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between her

9

protected activity and the adverse employment action. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

Protected activity entails opposing a practice that is made unlawful under the FMLA. *See* 29 U.S.C. § 2615(a)(2). An employee would be protected for opposing an employer's use of FMLA leave as a negative factor in a disciplinary action. *See* 29 C.F.R. § 825.220(c) ("[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies."). Fields's deposition testimony states that she told Pekar that she believed she was being disciplined for taking FMLA leave. She also alleges that she held a good faith belief that she was subject to *potential* discipline by the initial inclusion in her sick leave usage notices of four dates she claimed should be designated FMLA leave. Because non-renewal of Fields's contract is an adverse employment action, we will assume Fields established the first factor—engaging in protected activity—and turn to the third factor—causal connection between her protected activity and the adverse employment action.

Even viewing the evidence in the light most favorable to her, Fields cannot establish a causal connection between her FMLA leave complaints and the non-renewal of her contract. The sick leave usage policy was mentioned in Fields's performance evaluation; however, Pekar's reference is to Fields's stubborn misunderstanding of policies explained to her on a number of occasions and the problems created by her insistence on providing this misinformation to other employees or placing it in their files, issues Pekar could consider—along with her other performance problems—when deciding whether to renew Fields's contract. Moreover, there is no genuine dispute of material fact that the leave notices were not discipline under the policy or that the hours initially included in the

notice were properly designated as FMLA leave after Hillberry sought and obtained the necessary medical documentation for proper certification.

Fields failed to establish her prima facie case and the district court's ruling is affirmed.

## C.     Gender and Age Discrimination Pursuant to Ohio Law

In addition to her retaliation claim under the FMLA, Fields also asserts a retaliation claim under Ohio law, which prohibits employers from discriminating on the basis of sex.[2] Ohio Rev. Code Ann. § 4112.02(A). It is unlawful "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section." Ohio Rev. Code Ann. § 4112.02(I). "Ohio courts examine state employment discrimination claims in accordance with federal case[s] interpreting Title VII." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1115 (6th Cir. 2001). Therefore, the three-step *McDonnell Douglas* framework analyzed above is also applicable to Fields's state law claim. *Graham v. Best Buy Stores, L.P.*, 298 F. App'x 487, 495 (6th Cir. 2008).

The Board claims that Fields's e-mail complaints about gender discrimination do not constitute statutorily protected activity. We disagree. First, an employee may complain about discrimination to anyone. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) (stating that complaints "may be made to a co-worker, newspaper reporter, or anyone else about

---

[2]Any of Fields's claims based on age discrimination are untimely, as they must be brought "within one hundred eighty days after the alleged unlawful discriminatory practice occurred." Ohio Rev. Code Ann. § 4112.02(N). Fields's state retaliation claims, however, include complaints of gender discrimination, which are subject to a six-year statute of limitations. *See Meyer v. United Parcel Serv., Inc.*, 122 Ohio St. 104, 2009-Ohio-2463, 909 N.E.2d 106, 111-12, at ¶¶ 23-24 (discussing the Ohio Supreme Court's decision holding that Ohio Rev. Code Ann. § 2305.07's general six-year statute of limitations was applicable to sex discrimination claims). Accordingly, any claims based on gender discrimination are timely.

11

alleged discrimination against oneself or others"). The key for Fields's retaliation claim is that the manner of her opposition be deemed reasonable, *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008), and that the Board had knowledge of her complaints. *See Szeinbach v. Ohio State Univ.*, No. 11-3002, 2012 WL 3264398, at *2 (6th Cir. Aug. 10, 2012) (noting that a plaintiff's prima facie retaliation case requires demonstration that "the defendant knew of th[e] exercise of protected rights"). The Board does not argue that Fields's complaints were unreasonable. While her e-mail complaints were not made directly to Pekar or the Board, it is undisputed that the e-mails were viewed by Pekar, who was in charge of deciding whether to renew Fields's contract.

Second, the statements in Fields's e-mails were not generalized complaints about discrimination. The Board alleges that Fields was required to take an "overt stand" against gender discrimination for her activity to be considered statutorily protected. *See Comiskey v. Auto. Indus. Action Grp.*, 40 F. Supp. 2d 877, 899 (E.D. Mich. 1999). However, the *Comiskey* court relied on *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989), which merely held that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." In that case, Booker, who was demoted from a managerial position for performance problems, sent a letter to his employer blaming his problems on his supervisor and making an allegation arguably indicating that the supervisor viewed black employees as less capable. *Id.* at 1309. The court found that the letter did not oppose any unlawful activity by the employer but was instead questioning the employer's decision and "suggest[ing] that the focus of the company's inquiry should be on [Booker's] supervisor." *Id.* at 1313. The content of Fields's e-mails easily rises above this threshold, as she complained that she

12

was passed over for a job because of her gender and specifically requested information from the Ohio Civil Rights Commission.

In addition, Fields complained to both Pekar and a Board member regarding her perception of unequal standards for male and female supervisors. Though the Board objects to this evidence because it was not specified in Fields's complaint, on summary judgment the court is to view the record in its entirety and construe the facts contained within it in Fields's favor. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (noting that, in motions for summary judgment, "the court must review the record taken as a whole") (internal quotation marks omitted)). Based on these facts, the district court correctly found that Fields engaged in statutorily protected activity.

The Board further argues that Fields has not presented evidence establishing a causal connection between her protected activity and its decision not to renew her contract. However, Pekar specifically mentioned Fields's statements to others—suing for harassment—as one of the reasons for the mistrust between them. Because lack of trust was one basis for refusing to renew Fields's contract, a causal connection between the two exists. The Board, however, asserts that the trust between Fields and Pekar began to deteriorate several years before he saw the e-mails about a lawsuit, thus defeating a causal connection between the decision not to renew Fields's contract and the e-mails. However, a reasonable inference from the timing is that Pekar's concern regarding Fields's trustworthiness increased after e-mail monitoring revealed that Fields complained of gender discrimination. Importantly, the day after Fields sent the e-mail complaining about discrimination, Hillberry "heard through the grapevine" that Fields might sue the Board for discrimination and asked Griffin to document his interactions with Fields. The timing of these actions, coupled with Pekar's

13

statement in the performance evaluation, is sufficient to establish a causal connection. Accordingly, Fields has established her prima facie case.

Turning to the next stage, the Board presents two legitimate, nondiscriminatory reasons for its decision: (1) Fields's attitude and the lack of trust between Pekar and Fields; and (2) her job performance. These reasons satisfy the Board's relatively light burden of production at this stage. *See Provenzano*, 663 F.3d at 814-15 (requiring that the employer merely raise a genuine issue of material fact as to whether it discriminated against the employee).

At the final stage of the *McDonnell Douglas* analysis, "the presumption of discrimination is gone and the plaintiff must demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Id.* at 815. "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). And "the ultimate question remains whether [Fields] presented evidence from which a reasonable jury could logically infer" that the Board chose not to renew her contract for impermissible reasons. *Ondricko*, 689 F.3d at 651. "In evaluating pretext and the plaintiff's ultimate burden, the court should consider all evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." *Provenzano*, 663 F.3d at 812.

Fields fails to specifically address the pretext stage regarding her sex discrimination claim. However, evidence supporting the causal connection step of the prima facie case is also germane to

14

pretext though, as noted above, it must satisfy the more stringent standard at this final stage. The Board's first legitimate, nondiscriminatory reason—lack of trust—could potentially give rise to a genuine issue of material fact as to whether it was pretextual in nature. The reasons for non-renewal articulated in Fields's performance evaluation were based, at least in part, on the information Pekar gleaned from the "trapped" e-mails. He specifically mentioned the fact that Fields had indicated to others that she might sue the Board in the evaluation.

As to the second reason—job performance—Fields failed to address how her job performance was a pretextual reason for non-renewal of her contract. Fields was formally disciplined in August 2005 for mistakes in the Board packets and those problems were documented by Pekar. Although no further formal discipline was undertaken concerning those errors, complaints about Fields's work for the Board and problems with it continued and were documented until the time her contract was not renewed. An e-mail between Hillberry and Pekar indicates that on two occasions, Fields failed to request driving records for new hires in a timely manner. This resulted in the new hires being employed by the Board for several months before it discovered that their driving records were "unacceptable." In response to these errors, Fields apparently accessed Pekar's driving record and shared this information with one of the employees. In August 2006, Hillberry specifically instructed Fields to place an item on the Board's agenda, yet Fields failed to do so. Fields also received a memo from Pekar criticizing her failure to inform him of an important appointment to the Board and instructing her to provide him with correspondence in a timely manner. Fields does not dispute these job performance issues.

The timing surrounding Pekar's e-mail surveillance, Hillberry's instructions to document interactions with Fields, and Pekar's statements in the performance evaluation raises questions.

15

However, at this final stage, Fields must show pretext.  Instead, she ignores the legitimate reasons offered concerning her job performance and fails to demonstrate that they were not the true reason for the employment decision, but rather a pretext for discrimination.  Though Fields offered evidence that satisfies the causal connection step of her prima facie case, that evidence is insufficient to create a genuine dispute of material fact that the job performance reasons offered by the Board are pretext for discrimination.  Fields failed to identify evidence from which a reasonable jury could conclude that the Board's legitimate, nondiscriminatory reason was pretextual.

## III.  CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of the Board is **AFFIRMED**.