NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0799n.06

No. 12-5243

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Aug 29, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CAROLINE D. STEVENS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| SAINT ELIZABETH MEDICAL CENTER, | ) | EASTERN DISTRICT OF KENTUCKY |
| INC.; DONALD SAELINGER, M.D.; | ) | |
| PATIENT FIRST PHYSICIANS GROUP; | ) | OPINION |
| PHYSICIAN ASSOCIATES, LLC, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: BOGGS, ROGERS, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge. Plaintiff Caroline D. Stevens, who was employed by defendants Physician Associates, LLC and Patient First Physicians Group, served as a nurse and personal assistant to defendant Dr. Donald Saelinger, the Chief Executive Officer of Patient First, which was later acquired by Saint Elizabeth Medical Center. Stevens and Saelinger engaged in a consensual romantic and sexual relationship for several years. Shortly after the relationship ended, Stevens wrote a letter alleging that she was being pressured to take another position despite her desire to continue working with Saelinger. An independent investigation revealed that Stevens and Saelinger had sex at the office, and both were given the option of resigning or being terminated. Saelinger resigned; Stevens was terminated. Stevens subsequently filed suit against the defendants,

bringing claims of sexual harassment under Title VII and Kentucky's anti-discrimination laws, retaliatory discharge, and fraud. The district court granted summary judgment in favor of both Saelinger and the other defendants. Stevens appeals these decisions. For the following reasons, we **AFFIRM** the judgment of the district court.

## BACKGROUND

In mid-2007, while Stevens served as Saelinger's nurse and personal assistant, Stevens and Saelinger undertook a romantic and sexual relationship. Both parties were married to others, but Stevens eventually obtained a divorce. Saelinger repeatedly assured Stevens that he was also seeking a divorce, but his assurances were untrue.

Initially, there was no express discussion of the relationship at work. This changed, however, after Saelinger's wife confronted Stevens and Saelinger in October 2007 at an apartment he was renting. After this event, Stevens informed site manager Gary Brown that she and Saelinger were romantically involved. Around late summer 2009, Stevens chose to end the relationship after discovering that Saelinger had never filed for divorce. In September, Stevens saw Saelinger's wife in the Patient First parking lot. Stevens explained her history with Saelinger to co-worker Mary Ann Neuroth and asked that Neuroth walk with her to the parking lot. Neuroth reported the incident to Brown. Stevens claimed this revealed the "scandal" part of the relationship and also admitted mentioning the relationship to some of Saelinger's patients.

Shortly after the parking lot incident, Saelinger decided to reduce his patient load, allegedly so that he could spend more time on duties related to the pending merger with Saint Elizabeth. Stevens claimed that Brown pressured her to take a job at the Diabetes Center, in which she had

previously expressed interest. She further alleged that none of Saelinger's patients were transferred to other doctors and, although some appointments were moved to Saturdays, Stevens was not allowed to work on that day.

Although Stevens's hours were never actually reduced, she claimed this was because of an October 26, 2009 letter she sent to Brown, Jim Korb (the human resources director), and Saelinger. The letter stated that Stevens felt pressured to leave because of "personal agendas" and due to "perceived threats of legal action." She stated that her true desire was "to do my job in a non-threatening environment" and "to continue my work with Dr. Saelinger and our patients." Stevens claimed that later in the week, Brown asked her to speak with "Ken" presumably Ken Folz, the chief operating officer of Physician Associates and Korb and inform them that no harassment took place and she would not sue. Stevens was later allowed to come in on Fridays to do charts and messages.

Stevens's letter prompted an investigation by an outside attorney, which revealed that Saelinger and Stevens had sex several times in the office after working hours. This led to the end of the employment of both. Saelinger agreed to and signed a severance agreement. Stevens was given the option of resigning with benefits or being fired but she refused to resign and was subsequently terminated for having sex on the office premises. The second reason given for her termination was that the relationship had become a workplace disruption. When asked who made the decision to terminate her, Stevens stated that Joe Gross, President and CEO of Saint Elizabeth, was the only signature other than hers on the papers. Stevens said that she did not believe he made the decision alone. She admitted having no direct knowledge of Saelinger's involvement.

Stevens sued the defendants, alleging sexual harassment, gender discrimination, and retaliatory discharge in violation of Title VII and the Kentucky Civil Rights Act. She also asserted state-law claims for fraud and intentional infliction of emotional distress. Saelinger and Stevens filed motions for summary judgment. As to the sexual harassment and discrimination claims, the district court held that Saelinger did not meet the definition of "employer" under either statute. Although concluding that Saelinger could be found personally liable for retaliation under Kentucky law, the court determined that Stevens failed to establish the requisite causal connection between her October 26 letter and her termination. The court also ruled that Stevens failed to allege any pecuniary harm resulting from Saelinger's alleged fraud.

Following these rulings, additional deposition testimony was taken. This testimony shed light on three points: (1) Saelinger's actions toward Stevens after their relationship ended; (2) the effect of the relationship's demise on other office employees; and (3) the motivation behind the reduction in Saelinger's schedule.

In subsequent deposition testimony, Stevens claimed that Brown asked if she felt unsafe around Saelinger and she responded that she did not think that Saelinger "would force himself on" her. She claimed that she generally tried to avoid Saelinger, and Dorothy Dolwick confirmed that on one occasion Stevens sent her a text message from the bathroom asking that Dolwick let her know when Saelinger left. Stevens also claimed that Saelinger sexually harassed her after the relationship ended. She stated:

> He would close his office door or a patient door when I was in a room . . . and say I love you and different things and put his arms around me and kiss me. At times he would text me or call me repeatedly. If I would not respond, I was paged several

-4-

>times in the office . . . . He just wanted to hear from me. He . . . was more careful about what he typed or what was documented but he would still on occasion try to pursue me.

(R. 74-1 at Page ID 1392-93) She viewed her October 26 letter as describing "a hostile environment."

Brown testified that after Stevens found out Saelinger was not seeking a divorce, she had "a meltdown" and began discussing the relationship with her co-workers. Debbie Adams, the attorney who conducted the independent investigation, also testified that a number of Stevens's co-workers expressed "a kind of gossip fatigue" regarding the relationship.

As to the reduction in Saelinger's workload, Brown confirmed that this action was proposed because of the pending merger with Saint Elizabeth. When asked whether this reduction was partially meant to cause Stevens to resign voluntarily, Brown admitted that it also would have eliminated issues resulting from the relationship. Adams's notes from her interview with Saelinger indicate that a meeting concerning the reduction in his hours with his staff occurred after a conversation with Korb and Folz, during which they decided that a reduced schedule would, in effect, cause Stevens to leave. During his interview, Korb described the impetus for the meeting with Saelinger's staff as primarily based on the desire to have Stevens and Saelinger not work directly together.

The remaining defendants then filed a motion for summary judgment. The district court concluded that although Saelinger's actions following the demise of the relationship might have been "unwelcome" or "upsetting", they did not create an objectively hostile work environment. The court also rejected the retaliation claim, ruling that: (1) it was unclear whether either complaint relied on

by Stevens    the October 26 letter or her complaint to Brown    constituted protected activity; (2) the

plan to get Stevens to quit did not constitute an adverse employment action; and (3) even assuming

that Stevens's complaints arose out of Saelinger's advances and that her termination was an adverse

employment action, a causal connection between the two was not established because Saelinger was

fired first.

**ANALYSIS**

**I.      Standard of Review**

This court reviews a district court's grant of summary judgment de novo. *Chapman v. United*

*Auto Workers Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012). "Summary judgment is appropriate

only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine

issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Bobo*

*v. United Parcel Serv., Inc.*, 665 F.3d 741, 748 (6th Cir. 2012) (citing Fed. R. Civ. P. 56(a) & (c)).

The burden falls on the moving party to demonstrate that no genuine issues of material fact exist.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether summary judgment

is appropriate, appellate courts view the facts, including all inferences, in the light most favorable

to the nonmoving party. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012). A

jury, rather than a judge, is responsible for making credibility determinations, weighing the evidence,

and drawing legitimate inferences from the facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986). The central inquiry at the summary judgment stage "is whether the evidence presents

a sufficient disagreement to require submission of [the plaintiff's] claims to a jury or whether the

evidence is so one-sided that [the defendant] must prevail as a matter of law." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648 (6th Cir. 2012).

## II.     Discussion

### A.     Sexual Harassment Claim

#### 1.     Hostile Work Environment

Title VII protects employees "from a 'workplace [] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Two types of sexual harassment are generally recognized: (1) "harassment that creates an offensive or hostile environment"; and (2) quid pro quo harassment, where "a supervisor demands sexual favors as a condition for job benefits." *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 182 (6th Cir. 1992). The district court analyzed Stevens's claim under the "hostile work environment" rubric. In Stevens's response to the defendants' motion for summary judgment, however, she included arguments based on a quid pro quo analysis, and does the same in her brief before this court. The defendants argue that any cases involving quid pro quo sexual harassment should be disregarded.

In our view, the label affixed to the claim is not dispositive; instead, the focus should be on the substance of the plaintiff's allegations. We have noted that the Supreme Court has "signaled a shift from the use of the terms 'hostile work environment' and 'quid pro quo' in the employment liability context." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 561 n.2 (6th Cir. 1999). And the

Second Circuit has expressed hesitancy in "suggest[ing] a rigid rule that would require plaintiffs to use the words 'quid pro quo' or 'hostile work environment' in the district court or else be treated as having waived such claims." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006). That court explained:

> [B]ecause these terms are judicially created for analytical purposes, not distinctions in the statute itself, we think it is most appropriate . . . to look to the substance of the alleged misconduct of which the plaintiff complains rather than the terms used to describe it. If, for example, a plaintiff were to argue that she had been demoted for refusing to respond positively to her supervisor's sexual overtures, we would think that the assertion would preserve her quid pro quo claim even if she never used the phrase "quid pro quo" in the district court to describe it.

*Id.*

We agree that no "magic words" are necessary to state a claim and we should instead examine the substance of a plaintiff's allegations. Stevens's allegations focused on the creation of a hostile work environment. Her complaint described "pressure [she] was receiving to move from her job," and alleged Saelinger "sexually harassed [her] by creating a hostile work environment" following the end of their relationship. Similarly, Stevens's deposition testimony seems to contemplate a hostile work environment based both on Saelinger's unwelcome post-relationship advances and on other threats to her job. Stevens's complaints about Saelinger's behavior fit more

comfortably in the "hostile work environment" category,[1] and therefore the district court correctly employed this analysis. We apply that analysis as well.

To establish a hostile work environment claim based on sexual harassment, a plaintiff must make a prima facie showing that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) there is a basis for holding the employer liable. *Shields v. Fed. Express Customer Info. Servs. Inc.*, 499 F. App'x 473, 477-78 (6th Cir. 2012). A worker experiences an abusive working environment when her workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Barrett*, 556 F.3d at 514 (internal citations and quotation marks omitted). An objective and subjective test must be satisfied; "in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). In determining whether a working environment is hostile, this court looks at the totality of the circumstances and considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

---

[1]Saelinger's actions, as described by Stevens, do not suggest that she needed to succumb to his advances or face termination. *Cf. Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1162-63, 1173 (9th Cir. 2003) (finding that plaintiff's employment was conditioned on continued sexual activity with her boss when evidence demonstrated that she received negative performance evaluations after rebuffing his advances and received positive reviews when she had sex with him).

interferes with an employee's work performance." *Barrett*, 556 F.3d at 515 (internal citations and quotation marks omitted).

The district court found that Stevens was a member of a protected class and was subjected to unwelcome harassment based on sex, but failed to establish that Saelinger's actions created a work environment that a reasonable person would find objectively hostile. We agree. Although there were a number of text messages exchanged between Saelinger and Stevens during August and November 2009, they are neither offensive nor vulgar; in fact, most simply ask how Stevens is doing, respond to texts sent by Stevens, or inform Stevens of things happening in Saelinger's life. Occasionally, however, Saelinger's texts inappropriately express continued affection for Stevens, such as describing her as his "soul mate." As to interactions with Saelinger at the office, Stevens alleged that he would close an office door at times and "say I love you and different things and put his arms around me and kiss me." She also claimed that she sometimes hid from Saelinger in the bathroom. The texts of affection and the physical contact described may have been unwanted or unsolicited and were clearly inappropriate. However, the working environment was not permeated with discriminatory intimidation or ridicule, nor was it physically threatening such that it would have unreasonably interfered with Stevens's work performance.

In sum, neither the text messages nor the interactions between Stevens and Saelinger at work were so severe or pervasive that an objectively hostile environment was created. Importantly, it is questionable whether Stevens herself viewed these actions as severe and pervasive since the main objective expressed in her letter was to continue working with Saelinger. *Cf. Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 469 (6th Cir. 2009) (finding plaintiff's claim of a hostile work

environment to be "undermined by her admission that she herself did not feel harassed").

Accordingly, the grant of summary judgment on the hostile work environment claim is affirmed.

> 2. Retaliation

Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Under Kentucky's anti-discrimination statute, it is unlawful for one or more persons "to conspire . . . [t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful" by the statute. Ky. Rev. Stat. § 344.280(1). The only meaningful distinction between these provisions is that "[t]he Kentucky retaliation statute . . . permits the imposition of liability on individuals." *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 794 (6th Cir. 2000).

To establish a prima facie case of retaliation under either statute, an employee must show that (1) he or she engaged in protected activity; (2) the defendant knew of the exercise of the protected right; (3) an adverse employment action was subsequently taken against the employee; and (4) there was a causal connection between the protected activity and the adverse employment action. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008); *see also Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011). The defendant meets this burden by "clearly set[ting] forth, through the introduction of admissible evidence," such reasons for the adverse employment action. *Id.* at

815. "If a defendant successfully produces such a legitimate reason, then the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013).

Stevens challenges the district court's ruling on her retaliation claims against both Saelinger (under state law) and the defendants (under federal and state law). The district court noted, as does Saelinger, that Stevens's theory on what constituted her protected activity changed. As to Saelinger, she claimed that her October 26 letter was the protected activity; as to the other defendants, that it was a complaint made to Brown in September. In her brief before this court, Stevens appears to consider the September complaint to be the protected activity as to both defendants. Saelinger argues that Stevens may not assert a claim based on the September complaint against him because it was not raised to or considered by the district court. Both allegations were before the district court and it considered both in resolving the defendants' respective motions for summary judgment. We will do the same.

We begin with the retaliation claim against Saelinger. The first step is to determine whether the October 26 letter constituted protected activity. We have held that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). *Booker* does not, however, require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision. For example, in *Trujillo v. Henniges Automotive Sealing Systems North America, Inc.*, 495 F. App'x 651, 653 (6th Cir. 2012), the plaintiff complained to a

human relations officer about several racist remarks made by a member of management during a business trip. The plaintiff was fired a week later. *Id.* We concluded that the plaintiff had engaged in protected opposition. Unlike the letter in *Booker*, which complained about management practices and included a vague charge of "ethnocism" a term that the *Booker* court had been "unable to define" Trujillo's complaint only raised the issue of the racial comments, which the panel found "relevant to the underlying alleged Title VII violation in a way that is not the case in *Booker*," and "far more concrete than a charge of 'ethnocism.'" *Id.* at 655-56; *see also Fields v. Fairfield Cnty. Bd. of Developmental Disabilities*, 507 F.App'x 549, 556-57 (6th Cir. 2012) (concluding that plaintiff's e-mails to a friend complaining about discriminatory hiring practices and a subsequent request for the state civil rights commission's contact information which were surreptitiously viewed by her employer were not too generalized to constitute protected activity).

Some of the complaints in the letter could be construed as engaging in protected activity. Stevens mentioned a "desire . . . to do my job in a non-threatening environment," which could refer to sexual harassment on Saelinger's part. This inference, however, may have been undercut by the very next sentence, which expresses Stevens's desire to continue working with Saelinger. But even assuming that the letter meets the requisite threshold and that the remaining elements of the prima facie case are established,[2] legitimate non-discriminatory reasons were offered by the defendants for

---

[2]We perceive Stevens's termination, not the alleged "plan" to push her out of Saelinger's group, as the adverse employment action. We have defined an adverse employment action "as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 789 (6th Cir. 2000) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Although the consultation between high-level

Stevens's termination    her in-office sex with Saelinger and the ongoing office disruption resulting from the relationship.  There is no dispute that Saelinger, who was allegedly responsible for sexually harassing Stevens, did not fire her.  Stevens acknowledged that Joe Gross, President and CEO of Saint Elizabeth's, was the only other signature on her termination papers.  There is nothing to indicate that Gross was involved in the alleged plan to push Stevens out.  Moreover, the lack of pretext is also illustrated by the fact that Saelinger had no control over Stevens's discharge    he suffered the same fate as Stevens, and did so at an earlier point in time.

As to the remaining defendants, the September complaint was not protected activity based on this record.  That complaint is described in one of Stevens's affidavits, where she claimed that because she was pressured to agree to changed conditions of work, she talked with Gary Brown and expressed concern for her "job future."  This language does not express any concern about sexual harassment; in fact, the natural inference    evidenced by the facts and Stevens's statements during that time frame    is a fear of reduced hours or concern about job stability as the merger with St. Elizabeth moved forward.

For these reasons, the district court's grant of summary judgment in favor of Saelinger and the other defendants on the retaliation claims was appropriate.

**B.    Fraud**

In order to assert an actionable fraud claim, Kentucky law requires a plaintiff to prove the following elements by clear and convincing evidence:

---

management officials regarding this "plan" is undoubtedly troubling here, it did not lead to any significant change in Stevens's employment status or any of its attendant benefits.

-14-

> (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). A plaintiff must also "suffer an actual pecuniary loss." *Stahl v. St. Elizabeth Med. Ctr.*, 948 S.W.2d 419, 423 (Ky. Ct. App. 1997) (internal quotation marks omitted). The district court held that Stevens's fraud claim was deficient because she failed to allege or offer proof of such loss.

Stevens contends that her complaint sufficiently alleged damages based on fraud because she claimed that "[t]he tangible employment action was a request to transfer or lose full time position, changing hours and ultimately discharge" and that she lost her annual salary and benefits. Although these statements were included in the general allegations of Stevens's complaint, they addressed her sexual harassment claim. As to the fraud claim specifically, Stevens simply alleged that her reliance on Saelinger's false statements regarding his divorce caused "severe emotional injury" to her. There is no mention of any monetary damages resulting from Saelinger's misrepresentations. The district court appropriately granted summary judgment in favor of Saelinger on this claim.

### C. Resolution of State-Law Claims

Stevens argues that the district court should have dismissed her state-law claims without prejudice. The decision of whether to retain jurisdiction over state-law claims after federal claims have been dismissed is left to the district court's discretion. *See Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir. 2004). This court has stated that "[a] trial court must balance the interests . . . when deciding whether to resolve a pendent state claim on the merits. A district court

should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Id.* at 211 (internal quotation marks and citations omitted).

In *Harper*, we considered the following facts in determining that the district court did not abuse its discretion by exercising jurisdiction over the plaintiff's state-law claims: (1) the case had been on the district court's docket for 11 months; (2) discovery was complete; (3) the defendants' summary judgment motions were "ripe for decision"; and (4) the court had made several substantive rulings, meaning that "the district court was familiar with the facts of the case and already had invested significant time in the litigation." *Id.*

This case was on the court's docket for well over a year when the motion for summary judgment was granted in favor of Saelinger, and almost two years had passed when the motion for summary judgment in favor of the remaining defendants was granted. The district court, therefore, was familiar with the facts, and a significant amount of time had been invested in the litigation by everyone involved. And as the defendants point out, Stevens's claims based on state discrimination law are essentially the same as those brought under federal law. *See Keeton v. Flying J, Inc.*, 429 F.3d 259, 262 (6th Cir. 2005) (noting that sexual harassment claims brought under Title VII and Kentucky law "are analyzed in the same manner"). Although a retaliation claim under Kentucky law is unique in that an individual    such as Saelinger    can be held liable, this is the only element that differs from a Title VII retaliation claim. *See, e.g.*, *Taylor v. United Parcel Serv., Inc.*, No. 2011-CA-001210-MR, 2012 WL 5630421, at *2-5 (Ky. Ct. App. Nov. 16, 2012) (applying *McDonnell Douglas* burden-shifting framework to a retaliation claim brought under Kentucky law).

The court was sufficiently familiar with the facts upon which the claims of fraud and intentional infliction of emotional distress were based, and there is no suggestion that the applicable law was so unique or complex that a state court would be the more appropriate forum in which to address them. Moreover, Stevens requested that the district court grant summary judgment in her favor on the fraud claim. On balance, the interests of judicial economy support the district court's decision to resolve Stevens's state-law claims.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.